DECISION
{¶ 1} Defendant-appellant D'Juan Bell was indicted on one count of aggravated murder and one count of murder, both with firearm specifications, for causing the death of Laurice Welch. Welch was found dead in the early morning of December 12, 2003, on the sidewalk several doors down from his house on Neptune Drive in Springfield Township.
 {¶ 2} Bell's first trial on these charges resulted in a hung jury, and the trial court declared a mistrial. On retrial, the jury found Bell guilty of aggravated murder and murder, as well as two one-year firearm specifications. The trial court sentenced him to life in prison with the possibility of parole after serving 21 years.
 {¶ 3} In this appeal, Bell raises five assignments of error. After reviewing the record, we hold that Bell was not prejudiced by any trial court errors, and we affirm Bell's conviction and sentence.
 Testimony from the State's Witnesses {¶ 4} Welch and Bell were "close friends" and, at times, neighbors. Welch was a drug dealer, and he had sold crack cocaine to Bell's mother, Kathy Lay. The state speculated that Bell did not like this arrangement. Welch's mother, Kimberly, observed the two in a disagreement the day before Welch was shot. Later that evening, Bell had talked about Welch as if he were already dead to a group of young men who had gathered at the home of a neighbor, Jeff Smith.
 {¶ 5} Sixteen-year-old Jamel Combs was one of the young men present at Smith's house on the evening of December 11, 2003. He testified at trial that the group had been playing video games when Bell suggested that they get some alcohol. Bell asked Combs to walk with him to the house of Tamara Coker so that she could drive them to get a bottle of whiskey.
 {¶ 6} On the way to Coker's house, Combs heard Bell say, "I'm about to catch a body." Bell and Combs did not stop at Coker's house but proceeded to Bell's house instead. Combs waited outside on the driveway at Bell's request while Bell went inside his house and then into Welch's house next door.
 {¶ 7} Bell entered the Welch house near midnight and asked Welch's uncle and mother to see Welch. Welch was lying on pillows on the family-room floor, and his mother was unable to persuade him to get up. Bell then entered the family room and apparently persuaded Welch to accompany him outside. The pair went outside and greeted Combs, who was still waiting on Bell's driveway. The three then headed back up Neptune Drive in the direction of Coker's house. While walking, Combs heard Bell ask Welch if he had his gun on him. Combs saw Welch hand his handgun to Bell. Combs described it as a black and silver, semiautomatic handgun, about ten inches long.
 {¶ 8} Shortly thereafter, Bell asked Combs to run to Smith's house to get money from Smith for a bottle of whiskey. Combs did not know that Smith had already given money to Bell for the purchase. Combs hurried ahead on Neptune Drive to Smith's house. When he stopped to cross Morningstar Lane, Combs heard a gun fired behind him. He turned around and saw Welch falling to the ground about 10 to 15 yards away. According to Combs, Bell was standing about two feet away from Welch. Although Combs did not see anything in Bell's hands, he also did not see any other people in the area.
 {¶ 9} Combs ran to Smith's house, and Bell followed him. Combs saw Bell drop a gun into the bushes in front of Smith's house. They knocked on Smith's door. When Smith answered, Bell asked Smith if a dog could smell gunpowder at Smith's house from a location farther up the street. Bell also asked Smith for a plastic bag. Smith gave Bell the bag, and Bell gave it to Combs with instructions to put the gun in it. Combs wrapped the bag around his hand and grabbed the gun with the bag. He turned the bag inside out so that the gun was in it, and then he put the bag in Smith's backyard.
 {¶ 10} Bell told Smith that he had just been robbed. Bell went directly into Smith's bathroom and washed his hands. He ordered Combs to do the same. Bell took off his pants and coat and borrowed clothing from Smith.
 {¶ 11} Bell and Combs stayed at Smith's overnight. Combs and Smith observed Bell continually looking out the window of the house. Bell told Combs that if anyone asked where they had been all night, he was to say that they had been at his girlfriend Laquetta Kinebrew's house.
 {¶ 12} At daybreak, Bell and Combs left Smith's house, walking away from Welch's house and the bevy of police cars that had arrived at the crime scene. Bell left behind the boots, the coat, and the pants that he had worn to Smith's house. Combs left behind his coat and borrowed a hooded sweatshirt from Smith. After taking a circuitous route to Hamilton Avenue, they took a bus to Kinebrew's house. While there, Combs overheard Bell instructing Kinebrew to tell the police that he had been with her all night, if they asked her about his whereabouts.
 {¶ 13} A few days later, Combs went to Smith's house to retrieve the coat that he had left behind. Smith said that his coat was no longer there, and he told Combs to remove the gun from his premises. Combs took the gun home and set it outside, under his mother's inoperable car. He informed his older brother, Fernando Raab, where he had placed the gun. Bell called Combs that evening, and Combs told him that the gun was at his house. Bell said that he would come to get it so that he could sell it. Later that evening, Combs saw Bell walking outside his home with Raab. When Combs looked for the gun the next day, it was gone.
 {¶ 14} Two weeks after the murder, the police interviewed Combs and told him that he was suspected of murdering Welch. He wrote a short statement incriminating Bell. He supplemented this account in later statements. Additionally, he recanted parts of his original statement. For example, in his first written statement, he indicated that he had put the gun in Bell's car and not under his mother's car. Combs blamed the inaccuracy on nervousness. But Combs never changed any of the details surrounding the shooting in any of his statements.
 {¶ 15} The police also interviewed Smith near the time of Combs's interview. In Smith's first statement to the police, he did not indicate that Combs had been with Bell at the time of the murder, but Smith later corrected his statement to include this information.
 {¶ 16} The police interviewed Kinebrew the day after the murder. She told that police that Bell had arrived at her apartment at n p.m. on December n and that he had stayed the night. But she recanted in a later statement and said that Bell and Combs did not arrive until 8:oo a.m. on December 12.
 {¶ 17} Both Smith and Kinebrew provided testimony at trial that corroborated Combs's testimony concerning the events after the murder.
 Crime Scene and Forensic Evidence {¶ 18} Welch's body was discovered by Ryan Eason, a garbage-truck operator, at about 5:15 a.m. on December 12. He flagged down a woman driving by and asked her to call 911. Springfield Township Police Sergeant Richard Bley was the first officer to arrive on the scene. He approached Welch's body and was unable to detect a breath or pulse from the "really cold" body, which was face up on the sidewalk. He secured the scene with help from other officers.
 {¶ 19} Springdale Township Detective Pat Kemper examined the victim's body and clothing and found a baggie with crack cocaine, an electric pocket scale, $88, a cellular phone, and credit cards. The last outgoing call on Welch's phone was to the residence of Bell and his mother, Kathy Lay, at 8:54 p.m. on December 11. Several calls were made to Welch's phone after this time, some clearly after Welch's death. Many of these calls were made with Kathy Lay's cellular phone. Others came from the telephone for the residence of Latasha Willingham, another resident on Neptune Drive. Willingham had arranged a drug transaction between Welch and some other individuals earlier on December 11, 2003.
 {¶ 20} Kemper found several objects around the crime scene, including a crack pipe, a beer can, a white towel containing the DNA of a female, and a camouflage hat. The trace examiner was unable to conduct a DNA analysis on the hat because of the absence of DNA Welch's family identified the hat as Welch's and claimed that the hat had been worn by both Welch and Bell over a nylon do-rag. Rootless hairs found on the hat did not match the hair of either man.
 {¶ 21} Kemper found a spent bullet casing near Welch's body. William Schrand, a firearms expert, determined that this casing had contained the bullet that killed Welch. The examiner further determined that the bullet had been fired from a Hi Point .380 semiautomatic pistol using Federal Hydra Shock .380 automatic ammunition. He described the weapon as a black and chrome handgun that was six and three-quarters inches long.
 {¶ 22} During their investigation, the police learned that both Bell and Welch had allegedly possessed Hi Point .380 semiautomatic pistols at the time of the murder. In May 2005, the police recovered the gun linked to Bell. Schrand determined that this gun was not the murder weapon. The police never located Welch's gun.
 {¶ 23} Using forensic testing, Schrand was certain that Welch's assailant had fired the weapon from at least one foot away. He predicted that if the shooter had fired in a straight line during normal weather conditions, the weapon was about three and a one-half feet from the back of Welch's head.
 {¶ 24} Doctor Phalzgraf, the chief deputy Hamilton County coroner, performed an autopsy on Welch's body at 11 a.m. on December 12, 2003, after full rigor mortis had set in. He determined that Welch had died almost instantly from a single gunshot wound to the back of his head. Welch's body did not contain any other wounds. Phalzgraf could not pinpoint the time of death, but he opined, based upon his physical examination of the body, that the death could have occurred around midnight. A woman who lived across the street from where the body was found testified that she had heard a sound consistent with a gunshot at 12:15 a.m. on December 12.
 {¶ 25} Several weeks after the shooting, Springdale Police Officer Kenneth P. Klayer tracked down the clothing that Bell had left at Smith's residence. Smith had given the clothing away. The police submitted Bell's coat and the boots to the coroner's lab to test for blood particles. Neither contained blood particles. The coroner's lab also tested Bell's coat for firearm residue and was unable to detect any. But trace examiner Michael Trimpe testified that firearm residue typically dissipated four or five hours after the firing of a weapon.
 Bell's Conflicting Statements to the Police {¶ 26} After interviewing Welch's family on the morning of December 12, 2003, Kemper interviewed Bell to gain information about the murder. Bell told him that he had last seen Welch at 11 p.m. on December 11. He volunteered that he then went to Kinebrew's house in Mt. Auburn and that he was there when Welch was shot.
 {¶ 27} Kemper interviewed Bell again the following day after advising him of his Miranda rights. Bell gave conflicting information, and he mentioned that he had been with Combs and Smith on the evening of December 11. Kemper released Bell after the interview, but after gathering more evidence, he secured a warrant for Bell's arrest. In mid-January 2004, the police received a tip that Bell was at a residence in Cincinnati. The owner of the residence gave the police consent to search it. When the police arrived at her residence, the doors were all locked, and the police saw Bell running out the back door. They were able to stop and arrest him. An officer took him to the Springfield Township Police Department, where he was advised of his Miranda rights and placed in an interview room with Detective Kemper. Bell agreed to speak with Kemper but refused to sign a form acknowledging that he had waived his Miranda rights.
 {¶ 28} During this mid-January interrogation, Bell told Kemper that he and Combs had been at Smith's house in the late evening of December 11, 2003, and that they had then left to buy some alcohol. They stopped at Welch's house, and Bell went in to see if Welch wanted to come with them. Bell claimed that Welch did not want to go but that he talked him into it. The three of them walked away from Welch's house. Bell then told Kemper that he was within 100 feet of Welch when he was shot, but that he was not the one who had shot him. After this statement, Bell ended the interview. Kemper did not tape the interview, but he did take notes.
 Bell's Statements to Welch's Mother {¶ 29} After Welch's death, Bell contacted Welch's mother, Kimberly, several times, although he did not attend the funeral for Welch. The first time Bell contacted Kimberly was the day of the murder. He told Kimberly that he had come over the night before to invite Welch to visit some girlfriends with him, but that Welch did not go with him. Kimberly subsequently received a letter from Bell in September 2004. In this letter, he referred to a gun that he had helped a woman to purchase in November 2003 and that the police were trying to locate to determine whether it was the murder weapon. He proclaimed to Kimberly that the gun "wasn't the murder weapon." The police did not locate this weapon until May 2005, and at that time they determined that it was not the murder weapon.
 {¶ 30} At the conclusion of the trial, the jury found Bell guilty of aggravated murder and murder with one-year firearm specifications.
 {¶ 31} In his first assignment of error, Bell now argues that his convictions for aggravated murder and murder were not supported by sufficient evidence.
 {¶ 32} At the outset, we note that the trial court merged the two offenses into one conviction. Thus, Bell was only convicted of aggravated murder. Therefore, under this assignment of error, we must determine, after viewing the evidence in the light most favorable to the state, whether any rational trier of fact could have found all the essential elements of aggravated murder proved beyond a reasonable doubt.[2] Bell was convicted of violating R.C. 2903.01, which criminalizes the purposeful killing of another with prior calculation and design.
 {¶ 33} First Bell argues that the state failed to present sufficient evidence that he had shot Welch, where no one saw him fire a weapon, and his clothing from the night tested negative for gunshot residue. We reject this argument.
 {¶ 34} Admittedly Combs did not actually see Bell shoot Welch because Bell had told him to leave, but the state presented sufficient evidence for the jury to infer that Bell was the shooter. For instance, Combs testified that he saw Welch give Bell his pistol shortly before the shooting and that he saw Bell standing about two feet behind Welch immediately after Welch had been shot in the back of his head. Further, Combs saw Bell throw the pistol in the bushes shortly after Welch was shot. Once inside Smith's house, Bell took actions consistent with someone wanting to avoid detection for firing a weapon: he washed his hands and changed his clothing.
 {¶ 35} Combs's testimony was consistent with Schrand's testimony that the shooter was about three and one-half feet behind Welch when he fired a semi-automatic pistol. Combs's testimony about Bell's incriminating acts and statements after the crime were corroborated by several witnesses, including Smith and Kinebrew.
 {¶ 36} Bell gave conflicting statements to the police and Welch's mother about his whereabouts at the time of the murder and the events that had taken place. Further, he asked Kinebrew and Combs to lie on his behalf so that he would have an alibi. He also had evinced knowledge that a missing Hi Point .380 semiautomatic pistol was not the murder weapon.
 {¶ 37} Based on the foregoing, we hold that the state presented sufficient evidence that Bell had purposely killed Welch.
 {¶ 38} Next, Bell argues that the state failed to present sufficient evidence that he had committed the offense with "prior calculation and design." The legislature has not defined this phrase in the Revised Code. The Ohio Supreme Court has held that to establish "prior calculation and design," the evidence must demonstrate that the defendant had more than a few minutes of deliberation and that there was a scheme designed to implement the calculated killing.[3] A finding by the trier of fact of prior calculation and design is justified where the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide" and "the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill. "[4]
 {¶ 39} To determine whether the state presented sufficient evidence of prior calculation and design, we must look to the facts and evidence presented in this case.[5] Combs testified that Bell had told him he was going to "catch a body" at least ten minutes prior to the shooting. Combs overheard Bell ask Welch for his gun just prior to the shooting. Additionally, when Bell and Welch stopped walking just prior to the shooting, Bell told Combs to continue on to Smith's house and to get money for alcohol, even though Smith had already given money to Bell. Finally, Welch's mother testified that she was not able to convince Welch to get up when Bell came to visit at their house just prior to the murder. The jury could have easily inferred from this evidence that Bell had persuaded Welch to leave with him because he had a plan to kill him. Thus, when we view this evidence in the light most favorable to the state, we hold that it was sufficient to establish beyond a reasonable doubt that Bell had committed the offense with prior calculation and design.
 {¶ 40} In sum, we hold that the state presented sufficient evidence that Bell was guilty of aggravated murder. Accordingly, we overrule the first assignment of error.
 {¶ 41} In his second assignment of error, Bell argues that his conviction was against the manifest weight of the evidence. To resolve this claim, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[6] After this examination, we should grant a new trial only if we are convinced that a reasonable trier of fact could not have concluded that the defendant was guilty.[7] We are mindful that determining the credibility of a witness is a function primarily for the trier of facts, who has the unique opportunity to view the witness's demeanor while testifying.[8]
 {¶ 42} Bell argues that the testimony from Smith and Combs was unreliable and inconsistent. He claims that the jury should not have given any weight to this testimony because both witnesses were trying to avoid prosecution for their involvement in the offense, and because both witnesses had given multiple, conflicting statements to the police.
 {¶ 43} Admittedly Smith thought that his cooperation with the prosecution at trial would be helpful to the disposition of the obstructing-justice and tampering-with-evidence charges that were pending against him. But Smith's testimony at trial was consistent with statements that he had given to the police before he was charged with any crimes, and thus before his "cooperation at trial" became an issue. Further, while Smith had revised his original statement to the police, the jury was able to view Smith's demeanor as he explained these inconsistencies.
 {¶ 44} Conversely, Combs did not have any charges pending against him at the time of the second trial, although he could have faced perjury charges if his testimony had not been consistent with his testimony at Bell's first trial. Combs's statements contained discrepancies, but his accounts of the shooting itself did not vary. The jury was able to observe Combs's demeanor as he explained the discrepancies in the other facts.
 {¶ 45} Importantly, Smith's and Combs's testimony was consistent with the physical evidence, as well as with testimony from other witnesses. Under these circumstances, we cannot say that the trier of fact lost its way in rendering its guilty verdict. Accordingly, we overrule the second assignment of error.
 {¶ 46} In his third assignment of error, Bell argues that the trial court erred by denying his motion to suppress statements that he had made to Detective Kemper on January 15, 2004, after his arrest. Kemper interviewed Bell for approximately 45 minutes on this date. Bell told Kemper that he was within 100 feet of Welch when he was shot. On appeal, Bell challenges the admission of this statement, which he claims was made in response to questioning that continued after he had invoked his right to counsel.
 {¶ 47} At the hearing on the motion to suppress, Detective Kemper testified that he had interrogated Bell in an interview room at the Springfield Township police station after Bell had been arrested for Welch's murder. Kemper said that Bell had been advised of hisMiranda rights by the arresting officers. Kemper again advised him of his Miranda rights. Bell refused to sign a rights waiver, but he indicated that he was willing to speak with Kemper. Bell did not suffer any deprivation during the interview and did not appear to be under the influence of any substance that would have impaired his ability to understand the import of the situation.
 {¶ 48} Detective Kemper claimed that Bell did not request an attorney during the interview. On cross-examination, Kemper admitted that Bell had asked to make several phone calls and was provided access to a telephone. Near the end of the interview, Bell asked to call a person who Kemper thought was named Rodney Harris. Harris was an attorney. But Bell did not tell Kemper that Harris was an attorney, that he was attempting to call an attorney, or that he wanted to speak to an "attorney" or a "lawyer." Kemper testified that if Bell had requested to speak to a lawyer or an attorney, he would have stopped the interview.
 {¶ 49} Bell was unable to reach Harris, and Kemper continued the interrogation. Bell ended the interview after telling Kemper that he was within 100 feet of Welch when he was shot.
 {¶ 50} Appellate review of a motion to suppress presents a mixed question of law and fact.[9] The trial court serves as the factfinder.[10] An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence, but it must independently determine, without deference to the trial court, whether the facts satisfy the applicable legal standard.[11]
 {¶ 51} Bell claims that his Fifth and Sixth Amendment rights to counsel were violated when Kemper continued the interrogation despite his request to contact Harris. At the time of the interview, Bell's Fifth Amendment right to consult with an attorney had attached.[12] A suspect may waive this right, provided that his waiver is knowing, intelligent, and voluntary.[13] The state is required to prove, by a preponderance of the evidence, that the defendant made such a waiver.[14] The court determines whether the state has met its burden by viewing the totality of the circumstances in the case, including the defendant's background, experience, and conduct.[15]
 {¶ 52} When a suspect invokes his Fifth Amendment right to counsel, the police must cease the interrogation and may not initiate further interrogation until counsel is present.[16] But "the suspect mustunambiguously request counsel. * * * [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[17] If the suspect's statement "fails to meet the requisite level of clarity," the police are not required to stop the interrogation.[18]
 {¶ 53} In this case, the trial court found that Bell had knowingly, intelligently, and voluntarily made statements to Detective Kemper after he was informed of his Miranda rights, including his right to counsel. Further, the court found that Bell did not unequivocally or unambiguously request an attorney. The record supports these findings. Because Bell did not clearly invoke his right to counsel when he asked to call a man named "Rodney Harris," Detective Kemper did not violate the Fifth Amendment by continuing the interrogation after this request.[19]
 {¶ 54} Bell claims that Kemper's actions also violated his Sixth Amendment right to counsel. That right does not attach until the initiation of formal charges.[20] Because the state had not indicted Bell at the time of the January 15 interview, Bell's Sixth Amendment right to counsel had not yet attached.[21]
 {¶ 55} Thus, the trial court did not err in denying the motion to suppress where Bell's right to counsel was not violated. Accordingly, we overrule the third assignment of error.
 {¶ 56} In his fourth assignment of error, Bell argues that the trial court erred in overruling his motion in limine to keep out of evidence a gun that was generally agreed not to be the murder weapon. Bell had allegedly "stolen" this gun, a Hi-Point .380 semiautomatic pistol, from Ren eta Richardson a month prior to the murder. The gun was linked to the case because Bell had written a letter to Welch's mother, Kimberly, in October 2004 stating that this gun was not the murder weapon. In the letter, Bell wrote, "[You] remember when they searched my mom's house looking for a 380. Well Miss Kim I was in a gun shop wit a girl and they instantly assumpded I killed Reece because I was in a gun shop wit her. Well they went to her and threatened to take her kids away, if she did not say I stole her gun. So she did, then warrant was issued. Then when test results came back they found out they made wrong assumption because even if I would have stole her gun, it wasn't the murder weapon."
 {¶ 57} At the time Bell wrote the letter, the police had not yet located this weapon, and, therefore, they could not have tested it for compatibility with the bullet retrieved from Welch's head. In May of 2005, the police found the gun Bell referred to in the letter and forensically ruled it out as the murder weapon.
 {¶ 58} We begin our analysis by noting that the denial of a motion in limine is an interlocutory order. The denial of a motion in limine does not alone preserve a claimed error for review on appeal: the opponent must object when the proponent of the evidence later offers it at trial.[22] Thus, no reviewable error results from the denial of a motion in limine unless the proponent of the evidence later offers it at trial, the opponent objects, and the trial court erroneously overrules the objection.
 {¶ 59} Bell argues that the trial court erred in allowing the gun that was not the murder weapon into evidence. Although Bell had objected at trial to testimony concerning the gun, Bell failed to object when the state actually offered the gun into evidence as exhibit 35. Hence, absent plain error in the trial court's admission of the gun into evidence, this issue has been waived. An error rises to the level of plain error only where it is both obvious and outcome-determinative.[23]
 {¶ 60} Bell argues that the probative value of the gun was substantially outweighed by unfair prejudice, and that the trial court's admission of the gun into evidence allowed the jury "to hold and inspect the gun and be put in fear by the gun" during deliberations in a murder trial where the victim was killed with the same type of gun. The state argues that the gun's probative value was not outweighed by unfair prejudice.
 {¶ 61} The trial court must exclude evidence where its probative value is substantially outweighed by the danger of unfair prejudice.[24] The term "unfair prejudice" in relation to a criminal defendant refers to the ability of some relevant evidence to sway the factfinder into rendering a guilty verdict on a ground different from the state's proof of the alleged offense.[25] In this case, the jurors' handling of a gun that was identical to the murder weapon but was not the murder weapon had a great potential to instill unfair prejudice into the jurors' deliberations. And the probative value of the gun as a physical exhibit was minimal at best. Thus, the trial court erred in admitting the gun into evidence where its probative value was substantially outweighed by the danger of unfair prejudice.[26]
 {¶ 62} While this error was obvious, we cannot say that it was outcome-determinative for two reasons. First, any unfair prejudice from the jury's handling of the gun was tempered by the fact that the jury knew of the gun from Bell's incriminating statement to Welch's mother; that Welch's mother had informed the jury that Bell and her son carried guns; and that the jury was repeatedly informed that the gun was not the murder weapon.
 {¶ 63} Second, the other evidence presented by the state was such that we are confident that the jury would have found Bell guilty even if the gun had not been admitted into evidence. The evidence fit together like a jigsaw puzzle. The coroner testified that Welch's shooter was standing about three and a half feet behind him when he was shot. The firearms expert testified that Welch was shot with a .380 Hi-Point pistol. Welch's uncle testified that Welch carried a .380 Hi-Point pistol. Combs testified that he overheard Bell ask Welch for his gun shortly before Welch was shot. Combs also testified that he saw Bell standing about two feet behind Welch after the shooting. Additionally, Bell's inconsistent statements, his fabrication of an alibi, and his flight from the police indicated a guilty mind.
 {¶ 64} Ultimately, we are convinced that the jury did not base its decision on any unfair sentiment arising from the erroneous admission of the gun into evidence. Thus, the trial court's admission into evidence of a gun that was not the murder weapon did not rise to the level of plain error. Accordingly, we overrule the fourth assignment of error.
 {¶ 65} In his final assignment of error, Bell argues that the trial court erred in overruling his motion for a new trial based upon newly discovered evidence. He frames the issue as follows: "Where an eyewitness to a murder steps forward after the guilty verdict has been handed down, and the eyewitness will testify that another person other than the defendant committed the murder, and the eyewitness was unknown to the defendant prior to trial, a new trial should be granted."
 {¶ 66} The trial court's decision to grant or deny a new trial based upon newly discovered evidence must be affirmed absent an abuse of discretion.[27] In State v. Petro, the Ohio Supreme Court held that the trial court does not have discretion to grant a new trial unless the new evidence (l) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence.[28] Our first task in this case is to review whether the new evidence met the six criteria of Petro as a question of law.[29]
 {¶ 67} Prior to sentencing, Bell moved for a new trial under Crim.R. 33. Bell claimed that a person named Donte Graves had come forward after trial and revealed that he had been present when the homicide occurred. In an affidavit attached to the motion, Graves specifically stated that he was in a vehicle with Fernando Raab on Morningstar Drive at Neptune Road just prior to the murder. There he witnessed Welch in a fistfight with Combs, Raab's brother. Then Raab "jumped out of the car really fast and went toward[s] them. As I was getting out of the car to watch the fight, I heard a gunshot, `bang.'" Raab "jumped back in the car and took off really fast." Graves further implicated Raab in the shooting in the remainder of the affidavit.
 {¶ 68} Bell submitted other affidavits in support of his motion, including his own. In Bell's affidavit, he proclaimed his innocence and described two cars with occupants who were near Welch when he was murdered. Bell claimed that Raab was in one of these cars. After a hearing, the trial court refused to grant a new trial.
 {¶ 69} On appeal, Bell challenges the trial court's refusal to grant on new trial based upon Graves's affidavit, which he describes as newly discovered, exculpatory evidence.
 {¶ 70} The trial court rejected Bell's claim that Graves's affidavit warranted a new trial because it found that Graves's affidavit conflicted with a taped statement that Graves had given to the police in the investigation of another crime. In this taped statement, Graves clearly stated that he did not have any firsthand knowledge about Welch's murder. The court ultimately held that the affidavit was not reliable and did not satisfy the requirements of Petro.
 {¶ 71} After reviewing the evidence, we find no error in the court's characterization of Graves's affidavit as insufficient to satisfy the requirements of Petro. The state impeached the affidavit with Graves's prior recorded statement that he did not have any firsthand knowledge of Welch's murder. Under these circumstances, Graves's affidavit did not possess the force to create a strong possibility of a different outcome in a new trial.
 {¶ 72} We hold that the trial court did not err when it denied Bell's motion for a new trial based upon Graves's affidavit. Accordingly, the fifth assignment of error is overruled.
 {¶ 73} In conclusion, having found no reversible error by the trial court pertaining to Bell's aggravated-murder conviction, we affirm the judgment of the trial court.
HlLDEBRANDT, P. J., and PAINTER, J., Concur.
RALPH WINKLER, retired, of the First Appellate District, sitting by assignment.
[2] See State v. Jenks (1991), 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[3] See State v. Cotton (1978), 56 Ohio St.2d 8, 11,381 N.E.2d 190.
[4] Cotton at paragraph three of the syllabus.
[5] See State v. Taylor, 78 Ohio St.3d 15, 20, 1997-Ohio-243,676 N.E.2d 82.
[6] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[7] See id.
[8] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[9] See State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, at ¶ 8.
[10] See id.
[11] See id.
[12] See Edwards v. Arizona (1981), 451 U.S. 477, 482,101 S.Ct. 1880.
[13] See id.
[14] See Colorado v. Connelly (1986), 479 U.S. 157, 168,107 S.Ct. 515.
[15] See Edwards at 482.
[16] See id. at 484-485, citing Miranda v. Arizona (1966),384 U.S. 436, 474, 86 S.Ct. 1602.
[17] Davis v. United States (1994), 512 U.S. 452, 459, 114 S.Ct. 2350
(emphasis added); see, also, State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, 796 N.E.2d 506, at ¶ 18-19; State v. Williams,99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, atH32.
[18] Davis at 459.
[19] See Williams at ¶¶ 32-33
[20] See id. at ¶ 31, citing Moran v. Burbine (1986), 475 U.S. 412,431, 106 S.Ct. 1135, and Davis v. United States (1994), 512 U.S. 452,456, 114 S.Ct. 2350.
[21] See id.
[22] See State v. Brown (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus.
[23] See State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160,840 N.E.2d 1032, ¶ 60, citing Sate v. Sanders, 92 Ohio St.3d 245, 257,2001-Ohio-189, 750 N.E.2d 90; State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph two of the syllabus.
[24] See Evid.R. 403(A).
[25] See Old Chief v. United States (1997), 519 U.S. 172, 180,117 S.Ct. 644.
[26] See Evid.R. 403(A).
[27] See State v. Larkin (1996), 111 Ohio App.3d 516, 523,676 N.E.2d 906.
[28] See State v. Petro (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus.
[29] See Larkin at 523.