[Cite as *State v. Kottner*, 2013-Ohio-2159.]

# IN THE COURT OF APPEALS

## FIRST APPELLATE DISTRICT OF OHIO

## HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-120350 |
|  |  | TRIAL NO. B-1003804 |
| Plaintiff-Appellee, | : |  |
|  |  |  |
| vs. | : |  |
|  |  | *O P I N I O N.* |
| DANIEL KOTTNER, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 29, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**SYLVIA SIEVE HENDON, Presiding Judge.**

{¶1}    Following a bench trial, defendant-appellant Daniel Kottner was convicted of eight counts of burglary, one count of attempted burglary, and two counts of receiving stolen property.  The trial court sentenced him to an aggregate prison term of 20 years.  We affirm the trial court's judgment.

### The Background

{¶2}    Police from Hamilton and Butler counties were investigating a series of burglaries that had occurred in March and April 2010.

{¶3}    On April 5, 2010, at about 5:20 p.m., Blue Ash resident Elisabeth Feiler was driving home when she passed a black car with two occupants leaving her street.  Mrs. Feiler described the street as being "dead-end" and "narrow," with only five houses on it.  She said that the car was "like an Acura, a black, older car."  She waved at the passing car because she thought at first that it was her neighbor.  Mrs. Feiler did not think anything of it until she arrived at her house to find some of her jewelry on the front steps and the interior of the home ransacked.  A flat-screen television, a videogame system, cash, and most of her jewelry had been stolen.

{¶4}    A man who lived one street away from Mrs. Feiler told police that on the same day, he had seen a white man on his neighbor's porch, walking around and talking on a cellular telephone.  At the same time, a black man in a black Honda Acura slowly drove past the neighbor's house, six to eight times.  At one point, the black man got out of the car briefly to speak to the white man.

{¶5}    Several weeks later, on April 23, 2010, a homeowner in the Springfield Township area reported that she had arrived home to see a small black car parked in front of her house, a white man on her porch, and a black man looking over the backyard fence.  After the men drove away in the car, she called the police and gave them the car's license-

plate number. She later identified the men from photographs. The black man was Terry Simpson; the white man was Kottner.

{¶6} The black car was a Honda Acura registered to Simpson's girlfriend. Police set up surveillance on the car while it was parked at Kottner's apartment complex. They saw Kottner and Simpson arrive in Kottner's Ford Escape and move a television from Kottner's car to Simpson's girlfriend's car. When the two drove off, both cars were stopped by police and Simpson and Kottner were arrested, shortly after noon.

{¶7} Police recovered stolen property from Simpson's home and his girlfriend's car, and from Kottner's home and car. In Kottner's car, police found a handwritten note entitled, "Daniel's Plan," on which was written, "#1 Get Clean, via Jailin'[;] #2 Tie up loose-ends[;] #3 Turn myself in, ending wanted status in Montgomery County, possible in Fairfield also[.]"

{¶8} When Kottner was arrested, a Springfield Township police officer verbally informed him of his *Miranda* rights. Just before 2:oo p.m., Kottner was taken to the Springfield Township police department where the officer again advised him of his rights. Kottner signed a rights-waiver form and was interviewed by detectives.

{¶9} Then an officer from Butler County drove Kottner and a Springfield Township detective to several locations throughout Hamilton and Butler counties so that Kottner could identify multiple homes that he and Simpson had burglarized. The car ride lasted just over an hour. During the drive with the officers, when Kottner said he was feeling bad and that food would help him to feel better, the officers purchased food and drink for him. Kottner was then taken to the Butler County jail.

{¶10} At about 9:00 p.m. that evening, a detective from Forest Park, Ohio, went to the jail to interview him. The interview was videotaped.

{¶11} A few days later, detectives from Blue Ash, and Montgomery, Ohio, interviewed Kottner at the same jail, after they had advised him of his *Miranda* rights and he had again executed a rights-waiver form.

3

{¶12} Kottner was charged with 10 counts of burglary as a felony of the second degree, in violation of R.C. 2911.12(A)(2); one count of attempted burglary, in violation of R.C. 2923.02(A); and two counts of receiving stolen property, in violation of R.C. 2913.51(A).

{¶13} The trial court denied Kottner's motion to suppress his statements to police, and the case proceeded to a bench trial. At trial, Kottner denied having participated in any burglaries with Simpson. He claimed that the police had coerced him to make statements.

{¶14} Kottner was convicted of eight of the ten counts of burglary, and the trial court acquitted him of the remaining two counts. The trial court amended three of the eight burglary counts to felonies of the third degree. The court also convicted him of attempted burglary and of two counts of receiving stolen property.

{¶15} Kottner now appeals. He argues that the trial court erred (1) by overruling his motion to suppress evidence; (2) by allowing the state to introduce hearsay statements; (3) by convicting him despite the lack of evidence against him; and (4) by improperly sentencing him.

### *The Motion to Suppress*

{¶16} In his first assignment of error, Kottner argues that the trial court erred by overruling his motion to suppress the statements that he had made to police. He contends that: (1) his statements were not voluntarily made; (2) the *Miranda* warnings were stale by the time his second interview had occurred; (3) he had requested counsel; and (4) the police had made improper inducements to get him to confess.

{¶17} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Accepting those facts as true, the appellate court must

then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id.*

### A. Voluntariness

{¶18} First, Kottner contends that he did not voluntarily waive his rights before he made statements to police on the day he was arrested. Moreover, he claims that he was under the influence of drugs, and that when he made statements to the Forest Park detective that evening, he was exhausted from having been in custody for much of the day.

{¶19} The voluntariness of a suspect's waiver and statements are both measured by a totality-of-the-circumstances test. *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996). Evidence of coercion or overreaching by the police is necessary for a finding of involuntariness. *State v. Hill*, 64 Ohio St.3d 313, 318, 595 N.E.2d 884 (1992), citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶20} The record reveals that Kottner had been advised of his rights two times and he had executed a rights-waiver form before being taken to the Butler County jail. According to police, he did not appear to be under the influence of drugs or alcohol, and he appeared to understand his rights. Kottner indicated that he was college-educated and responded appropriately to their questions. At no time did he request counsel or indicate an unwillingness to speak with police.

{¶21} With respect to Kottner's claim that he had been under the influence of drugs, the trial court commented that it had reviewed the videotaped recording of the Forest Park detective's interview. The court noted that Kottner was "very lucid in that, very well oriented, didn't request a lawyer." Moreover, the court found that Kottner "did not appear under the influence of alcohol or drugs. He clearly understood what he was doing. He was able to discuss with the interviewer intelligently and make the points that he wanted to make. * * * [H]e clearly understood what he was doing. He clearly understood his [r]ights."

{¶22} Our review of the record convinces us that the trial court properly concluded that Kottner's waiver and statements were voluntary. Kottner's signing of a written waiver form is strong evidence that his waiver was valid. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). Although the interviews on the day of his arrest took place over several hours, Kottner was not deprived of amenities or breaks. He was provided with food and drink, and there was no evidence of coercive conduct by police. We conclude that the trial court's findings that Kottner had knowingly and voluntarily waived his rights and had voluntarily made statements were supported by competent, credible evidence. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

### B. The Warnings Were Not Stale

{¶23} Next, Kottner contends that the *Miranda* warnings he had received at the time of his arrest were "no longer effective" when he made statements to the Forest Park detective at the Butler County jail later that evening. However, police do not need to re-administer *Miranda* warnings to a suspect before each subsequent interrogation when a relatively short period of time has elapsed since the initial warnings. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 119; *State v. Treesh*, 90 Ohio St.3d 460, 470, 739 N.E.2d 749 (2001); *Wyrick v. Fields*, 459 U.S. 42, 48-49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).

{¶24} When deciding whether initial warnings remain effective for later interrogations, courts look at the totality of the circumstances. *Powell* at ¶ 119, citing *State v. Roberts*, 32 Ohio St.3d 225, 232, 513 N.E.2d 720 (1987). Courts are instructed to consider: (1) the length of time between the initial warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in different places; (3) whether the warnings given and the subsequent interrogation were conducted by different officers; (4) the extent to which statements given in the subsequent

interrogation differed from previous statements; and (5) the apparent intellectual and emotional state of the suspect. *Roberts* at 232, quoting *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201 (1975). The purpose of the test is to "determine whether the initial warnings have become so stale and remote that there is a substantial possibility that the individual was unaware of his constitutional rights at the time of the subsequent interrogation." *State v. Grissom*, 1st Dist. No. C-100542, 2011-Ohio-1796, ¶ 13, citing *McZorn* at 434.

{¶25} In *Powell*, the Supreme Court found that initial *Miranda* warnings were not stale even though more than 30 hours had elapsed between the warnings and the suspect's subsequent interview. The court pointed out that the suspect had remained in continuous custody since the warnings had been given, that both interviews had been conducted by the same officer at the same location, that the suspect's later statement essentially recounted what he had already said in his earlier statement, and that the suspect was "mentally alert" at the time he gave the later statement.

{¶26} In this case, Kottner remained in continual police custody from the time of his arrest in Springfield Township to the time of his interview at the Butler County jail. That interview occurred within seven hours of Kottner's signing the waiver-of-rights form at the Springfield Township police department. That interview "was part of a series of discussions" that Kottner had with police about burglaries in the area. *See State v. Brewer*, 48 Ohio St.3d 50, 60, 549 N.E.2d 491 (1990) (statement admitted that was made one day after the suspect was advised of his *Miranda* rights by a different police department). In addition, the videotaped recording of his interview reveals that Kottner was mentally alert, attentive, and lucid during the interview. The record yields no indication that the *Miranda* warnings were no longer fresh in Kottner's mind or that he was unwilling to speak with the detective.

{¶27} Given the totality of the circumstances, we conclude that the initial *Miranda* warnings provided to Kottner by the Springfield Township police officers in the afternoon

were not stale when Kottner made statements to the Forest Park detective that evening at the Butler County jail. So no new warnings were required.

### C. No Request for Counsel

{¶28} Next, Kottner argues that his statements to the detectives from Blue Ash and Montgomery several days after his arrest were obtained in violation of his *Miranda* rights. He contends that questioning should have ceased when he "made reference to speaking to counsel."

{¶29} Once a suspect clearly and unambiguously invokes his right to counsel, police must immediately cease questioning. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If a suspect's reference to an attorney is ambiguous or equivocal "in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," police do not need to stop their questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

{¶30} The Ohio Supreme Court has held that the following statements were not unequivocal or unambiguous requests for counsel: "[Aren't] I supposed to have a lawyer present," *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 19; "I think I need a lawyer," *State v. Henness*, 79 Ohio St.3d 53, 62, 679 N.E.2d 686 (1997); and "when I talk to my lawyer," *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 95.

{¶31} Similarly, we have concluded that the following statements were not unequivocal requests for counsel: "I can get a lawyer," *State v. Newman*, 1st Dist. No. C-090735, 2010-Ohio-4180; "I would prefer a lawyer but I want to talk to you now," *State v. Carr*, 1st Dist. No. C-090109, 2010-Ohio-2764; a request to speak to a district attorney to obtain a "deal," *State v. Long*, 1st Dist. Nos. C-090248 and C-090249, 2010-Ohio-1062; and

a request to call a person whom the suspect failed to identify as an attorney, *State v. Bell*, 1st Dist. Nos. C-050537 and C-050539, 2007-Ohio-310.

{¶32} In this case, after being advised of his rights by the Blue Ash detective, Kottner signed a rights-waiver form and indicated his willingness to speak. During the interview, the detective asked Kottner if the police had recovered any property during the search of his home, and Kottner answered, "I don't know. I haven't talked to any lawyer or anything yet." Kottner told the detective that he understood that "[the detective's] position in this is primarily to recover property. * * * I would, honestly, I mean, in my position now I would love to help you with that as much as I can. * * * Unfortunately, I haven't talked to a lawyer yet." Under the precedent cited above, these passing references to counsel did not amount to an unequivocal or unambiguous request for counsel.

### D. No Improper Inducements by Police

{¶33} Finally, Kottner claims that the Blue Ash detective made improper inducements in order to obtain a statement from him.

{¶34} The detective told Kottner, "You're going to face criminal charges no matter what. * * * [Y]ou got to realize that." And he said that he could tell the prosecutor that Kottner had been helpful in the recovery of the property he had stolen, or that Kottner had been remorseful. He stated that he could ask the prosecutor to reduce the level of the felony, or that he could make "recommendations for probation or whatever it is." He told Kottner, "I will go to bat for you. Okay. You are going to get charged. * * * With the three burglaries from me. * * * I'm not going to press for any kind of maximum time. * * * Because of your cooperation." He also said, "I'll go to bat for you with the prosecutor. * * * I'm not going to guarantee that you won't get any time."

{¶35} The detective indicated his own willingness to attest to Kottner's cooperation, but made no guarantees about Kottner's potential sentence. "Promises that a defendant's

cooperation would be considered in the disposition of the case, or that a confession would be helpful, do not invalidate an otherwise legal confession." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994); *State v. Carovillano*, 1st Dist. Nos. C-060658 and C-060659, 2007-Ohio-5459. Consequently, the detective's statements did not constitute improper inducement so as to affect the voluntariness of Kottner's statements.

{¶36} Accordingly, we hold that the trial court properly denied Kottner's motion to suppress his statements. We overrule the first assignment of error.

### *The Admission of Hearsay*

{¶37} In his second assignment of error, Kottner argues that the trial court erred by allowing the state to introduce hearsay statements made by one of the burglary victims, Yuji Hongu, who did not testify at trial. However, we find that the admission of his statements, even if erroneous, was harmless because the content of the statements was corroborated by admissible and overwhelming evidence of Kottner's guilt of the Hongu burglary, as we discuss below in the disposition of his third assignment of error. *See* Crim.R. 52(A); *State v. Williams*, 38 Ohio St.3d 346, 349-350, 528 N.E.3d 910 (1988). We overrule the second assignment of error.

### *Weight and Sufficiency*

{¶38} In his third assignment of error, Kottner challenges the weight and sufficiency of the evidence upon which his convictions were based.

{¶39} Kottner was convicted of three counts of burglary in violation of R.C. 2911.12(A)(3), felonies of the third degree. For those counts, the trier of fact had to find that he had trespassed in an occupied structure by force, stealth, or deception with the purpose to commit in the structure any criminal offense. And Kottner was convicted of five counts of burglary in violation of R.C. 2911.12(A)(2), felonies of the second degree. For those counts,

the state was required to prove the additional element that the structure was a person's "habitation" and that the offense occurred "when any person other than an accomplice of the offender is present or likely to be present." In addition, Kottner was convicted of an attempted burglary.

### A. No Testimony by the Property Owner

{¶40} Kottner specifically contends that the state failed to prove that he had committed the third-degree burglary of the residence of Yuji Hongu, where the victim did not testify at trial. We disagree.

{¶41} A Blue Ash police sergeant testified that on April 5, 2010, he was dispatched to an apartment in response to a 911 call about a break-in. On his arrival, the sergeant saw that the apartment door was splintered and its lock mechanism was broken apart. He noted a footprint on the door where it appeared that the door had been kicked open. A window screen had been cut out of a locked window. The officer saw evidence that a person resided in the apartment, including furnishings, numerous personal belongings, and mail.

{¶42} Blue Ash police detective James Kelley, the investigator assigned to the Hongu break-in, interviewed Kottner a month later, on May 3, 2010. Kottner admitted that he and Simpson had stolen golf clubs from the apartment. He said that the day after the Hongu burglary, he and Simpson had sold the clubs at Play It Again Sports. Kottner said he had presented his own identification and had been paid by a check.

{¶43} The day after his interview with Kottner, Detective Kelley interviewed Joshua Snow who worked at Play It Again Sports. Mr. Snow produced a sales receipt dated April 6, 2010, for two sets of golf clubs, showing a photocopy of Kottner's driver's license. And he identified Simpson from a photographic lineup as the man who had accompanied Kottner. According to Detective Kelley, only a single golf club remained at the store from the two sets of stolen clubs, and that club was returned to Mr. Hongu.

11

{¶44} From this evidence, the trier of fact could reasonably infer that Kottner and Simpson had trespassed in Mr. Hongu's residence by force or stealth and that they had stolen his golf clubs.

### B. Likely To Be Present

{¶45} Kottner argues that, with respect to the second-degree burglary of the residence of Jeanne Gerdes, the state failed to prove that anyone was likely to be present when the offense occurred.

{¶46} In order to prove that someone was "likely to be present," the state must adduce specific evidence concerning the habits of the residents or others who have access to the premises to demonstrate the likelihood of a person's presence. *See State v. Grier*, 1st Dist. No. C-110240, 2012-Ohio-330, ¶ 5; *In re Meatchem*, 1st Dist. No. C-050291, 2006-Ohio-4128, ¶ 16. "A person is likely to be present when a consideration of all the circumstances would seem to justify a logical expectation that a person could be present." *Id.*, citing *State v. Green*, 18 Ohio App.3d 69, 72, 480 N.E.2d 1128 (10th Dist.1984).

{¶47} Merely showing that people lived in a residence is insufficient. *See State v. Fowler*, 4 Ohio St.3d 16, 18-19, 445 N.E.2d 1119 (1983). The Supreme Court has held that the "likely to be present" element was satisfied where there was evidence that a home was regularly inhabited, the residents had been in and out on the day of the offense, and the home had been burglarized when the residents were temporarily absent. *State v. Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977), paragraph one of the syllabus. Moreover, evidence that residents were home on the day of the crime, that two of them occasionally worked at different locations, and that they were not always home at the same time has been held sufficient to prove the "likely to be present" element. *Fowler* at 19.

{¶48} In this case, Jeanne Gerdes testified that on April 9, 2010, she had locked her home when she left in the morning. When she returned to her home at 6:00 p.m., she

discovered that her door was unlocked and that her home had been broken into. Ms. Gerdes said that her typical work day was from 8:00 a.m. to 5:00 p.m., but her job enabled her to "come and go." So on occasion, she returned to her home during the daytime. Sometimes she had to stay at home when she was sick. A few days before the burglary, she had used vacation time to stay at home. From this evidence, the trier of fact was free to infer that Ms. Gerdes was likely to be present at the time of the burglary.

### C. Attempted Burglary

{¶49} Kottner also argues that the state presented insufficient evidence that he had committed an attempted burglary of the Sheafer residence. To prove an attempt, the state was required to show that Kottner had knowingly "engage[d] in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). Criminal attempt occurs when an offender "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus, *overruled on other grounds*, *State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977). A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose." *Id.*; *State v. Andrews*, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E.2d 775, ¶ 78 (1st Dist.).

{¶50} The substantial-step standard focuses on the "overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal attempt becomes apparent." *Woods* at 132; *State v. Ojile*, 1st Dist. Nos. C-110677 and C-110678, 2012-Ohio-6015, ¶ 51.

{¶51} In this case, Mrs. Sheafer testified that on April 23, 2010, just before noon, she was driving home from picking up her son at preschool. As she approached her home,

she saw a white man, later identified as Kottner, standing on her front porch. Kottner was looking in her window while he was apparently ringing the doorbell. A small black car was parked in front of the house. When Mrs. Sheafer pulled into her driveway, she saw a black man standing in her side yard looking over the back fence. She got out of her car and asked him what he was doing. The man replied that he had not been looking over her fence. He claimed that he had been looking at the landscaping for the house next door that was for sale.

{¶52} At that point, Kottner approached Mrs. Sheafer and asked if anything unusual was going on with the home next door that was for sale. He asked her that several times. She told him that there was nothing unusual and that he should call the realtor listed on the sale sign if he had any questions about the house. But Kottner kept asking her if anything unusual was going on. Mrs. Sheafer found the men's behavior to be suspicious. As they drove away in the black car, she wrote down its license plate number and called police.

{¶53} In his statement to the Forest Park detective, Kottner said that he and Simpson would pick houses at random to burglarize. In the middle of the day, they would typically park their car, "and kind of sit around for a minute and get a feel for what's going on." They would check a house to see if anybody was home. If anybody was home, they would pretend to be interested in a neighboring house that was for sale or pretend that they were simply at the wrong house.

{¶54} Kottner admitted to the Blue Ash detective that he and Simpson had selected the Shaefer home because it was a:

> [r]eal new [expletive], real nice house. * * * I remember picking this house
> because there was a house for sale right next to it. And I'm thinking, okay,
> you know, that gives me an excuse to [hang] around and ask questions about
> the house and not, you know, draw so much attention.
>
> Well, we're checking out the house next door, and this lady comes up while
> Terry is looking over the [expletive] fence in the back, and I'm at the front

14

door, and she immediately sees him and starts tripping out on him, like, what the [expletive].

So, I started doing what I can to ask questions about next door. But the lady kind of knew, you know, you could tell from her reaction, [expletive], she knew, you know.

{¶55} Kottner and Simpson had taken substantial steps in a course of conduct that would culminate in a burglary of the Sheafer home. They operated during the daytime and parked on the street. They had specifically targeted the home because it fit their preference for a nice home with a nearby house for sale. As soon as they were confronted, they commenced their plan to feign interest in the house next door that was for sale. Although the two were stopped before they were able to enter the house, their trespass on the premises to more closely examine the house was certainly in furtherance of a burglary offense. Their actions and Kottner's statements to police evinced a clear purpose to commit the crime. This was sufficient evidence that Kottner had committed an attempted burglary.

{¶56} With respect to the remaining offenses, we conclude that they were based upon sufficient evidence and they were not against the manifest weight of the evidence. Although Kottner denied or minimized his involvement in the offenses, the trial court was in the best position to determine if his testimony was credible. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Following our review of the record, we have no doubt that a rational trier of fact, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Kottner had committed the offenses. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Therefore, the evidence presented was legally sufficient to support his convictions. Moreover, this is not an "exceptional case in which the evidence weighs heavily against the conviction." *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We overrule the third assignment of error.

*Sentencing*

{¶57}  In his fourth assignment of error, Kottner argues that the trial court erred by improperly sentencing him.

### A.  Allied Offenses

{¶58}  First, Kottner contends that the trial court erred by sentencing him separately for two receiving-stolen-property offenses in addition to the burglary offenses in Counts 8 and 10 of the indictment because they were allied offenses.  However, where, as here, the state presented evidence that Kottner had retained and had pawned stolen property that was separate and apart from the property associated with the burglary offenses in Counts 8 and 10 of the indictment, Kottner was properly convicted of both of the receiving-stolen-property offenses.  *See* R.C. 2941.25(B); *see also State v. Jillson*, 1st Dist. No. C-100340, 2012-Ohio-1034, ¶ 12, citing *State v. Bickerstaff*, 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (1984); *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 51.

### B.  Consecutive Sentences

{¶59}  Kottner also argues that his sentences were contrary to law because the trial court erred by failing to make the necessary statutory findings before it imposed consecutive sentences.  This is simply not the case.  The trial court fully complied with the requirements of R.C. 2929.14(C).  The court completed a felony-sentencing-findings worksheet on which it noted that consecutive terms were necessary to protect the public and were not disproportionate to the seriousness of Kottner's conduct.  *See* R.C. 2929.14(C)(4).  In addition, the court found that the harm caused by Kottner's offenses was so great that no single prison term for any offense would adequately reflect the seriousness of his conduct, and that Kottner's criminal history demonstrated a need to protect the public.  *See* R.C. 2929.14(C)(4)(b) and (c).  In addition, the trial court's statutory findings are well supported

by the record. *See State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 14; *State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 20.

### C. Imposition of Prison Terms

{¶60} Finally, Kottner argues that the trial court improperly imposed prison terms for the receiving-stolen-property offenses, which were fifth-degree felonies. However, Kottner was simultaneously being sentenced for multiple second- and third-degree felonies, and he had previously served a prison term for burglary. Therefore, the trial court properly imposed prison terms for the fifth-degree felonies. *See* R.C. 2929.13(B). We overrule the fourth assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM** and **DEWINE, JJ.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.